IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AARON RYAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 25 C 10986 |
| ) | |
| OFFICER KAEDYN URBAN and ) | |
| BRAIDWOOD POLICE DEP'T, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Aaron Ryan has filed a *pro se* lawsuit against Kaedyn Urban, a Village of Braidwood police officer, and the Braidwood police department. Ryan's claims concern events on January 18, 2025. Ryan alleges that he was traveling in a motor vehicle when Urban stopped him. He alleges that this was done based on a "Flock" license plate alert connected to a missing person report. As best as the Court can make out, a Flock alert involves a camera that reads license plates, connects the plates with any existing alerts, and then notifies relevant police departments.

Based on the complaint and documents that Ryan has attached to it, Ryan, who lives in Marseilles, Illinois, appears to allege that another person, evidently his girlfriend, reported him missing around 1:30 a.m. on January 18. An Ottawa police officer prepared a missing person report and caused it to be uploaded into the LEADS system, a computerized system operated by the Illinois State Police that provides information to law enforcement officers within the state of Illinois.

Later that morning, a little after 8:00 a.m., an Ottawa police officer was dispatched to a street just south of Interstate 80 after the Ottawa police department received a Flock alert on Ryan's license plate. The Ottawa officer found Ryan's vehicle in a parking lot, approached it, spoke with Ryan, and told him about the missing person report. Ryan said that his girlfriend had overreacted and that he was fine, had made no suicidal statements, and was not feeling suicidal. The Ottawa officer told the dispatcher to remove Ryan from the LEADS system as a missing person.

About five hours later, just before 1:00 p.m., officer Urban (of the Braidwood Police Department) was on patrol and received a "Flock hit" for a missing person in a particular vehicle traveling through Wilmington, which is near Braidwood. Urban asked dispatch to confirm if the owner of the vehicle was still reported as missing. While Urban was doing this, the vehicle passed Urban, who followed it and determined to stop the vehicle while awaiting confirmation. Urban and another officer, named Peterson, executed the stop and began talking to Ryan. According to Urban's report, while they were talking, dispatch reported back that Marseilles had removed the missing person report, though it was still in the Flock system. Ryan advised the officers that his girlfriend had made the report "for no reason" and that he had not even been gone for 24 hours.

According to Urban's report, "Sergeant Peterson requested Aaron's IL driver's license co to confirm who we were talking to and make sure there were no other problems." Urban's report says that Ryan stated that his license had been suspended but that he was working on getting a permit so that he could drive again. Urban then asked dispatch to perform a LEADS inquiry, and dispatch reported back that Ryan's

2

license had been suspended for three years in December 2024. Urban then asked Ryan to step out of his vehicle and arrested him. A towing service was called to remove his vehicle. The officers performed an "inventory" of the vehicle and report finding—in a "cigarette disposal cup in the right rear passenger door"—a small baggie containing a white powder. Urban's report says that Ryan was read his rights and was then asked about the baggie; he reported that "it was heroin but not his" and was "his friend's from last night." Ryan was taken to the Braidwood police department, and his vehicle was towed. A field test on the powder showed a positive result for fentanyl (1.2 grams). Urban's report says that Ryan was charged with possession of a controlled substance and driving while his license was suspended.

Ryan alleges in his complaint that the charges against him were later dismissed. However, due to the loss of his vehicle, he lacked transportation to travel to work, and as a result he lost his job. Due to his loss of income, he lost his apartment because he could not pay rent, and he ultimately became homeless.

Ryan has sued Urban and the Braidwood Police Department for violating his Fourth Amendment rights (it is not clear why he has not also sued Peterson, but that's not an issue at this point). He seeks to recover damages.

Urban and the police department have moved to dismiss. The department points out, correctly, that it is not a suable entity. *See, e.g., Santoyo v. Village of Oak Lawn*, 2024 WL 4930393, at n.* (7th Cir. Dec. 2, 2024). But that is an easily-fixed problem; Ryan could name the Village of Braidwood as a defendant, as an indemnitor of its officers under 745 ILCS 10/9-102. So the Court will address the remaining issues in the motion to dismiss.

3

The defendants' main argument is that the stop was justified because there was an active missing person alert involving the vehicle. They contend that there was reasonable suspicion authorizing the stop and that even without *criminal* suspicion, an officer may stop a person or vehicle under the "community caretaking" doctrine to ensure public safety or the "emergency aid" exception to the Fourth Amendment. Mot. to Dismiss at 5.

The law is clear that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *United States v. Hensley*, 469 U.S. 221, 232 (1985). Part of the principle of *Hensley* is that "[t]he law enforcement interests promoted by allowing one department to make investigatory stops based upon another department's bulletins or flyers are considerable, while the intrusion on personal security is minimal." *Id.* If the bulletin has been issued *without* reasonable suspicion, a stop in objective reliance on it violates the Fourth Amendment, though the officer making the stop "may have a good-faith defense to any civil suit." *Id.*

Here there is no contention that the underlying bulletin involved the commission of a crime, or that the Braidwood officers understood or believed that it did. Rather, it seems relatively clear that they understood the bulletin to involve a report of a missing person. As the defendants argue, however, that does not by itself render their stop of Ryan's vehicle in reliance on the bulletin unreliable. The "community caretaking" doctrine, an aspect of Fourth Amendment law, recognizes that "police officers who

4

patrol the public highways are often called to discharge noncriminal community caretaking functions, such as responding to disabled vehicles or investigating accidents." *Caniglia v. Strom*, 593 U.S. 194, 196 (2021) (cleaned up) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). The Court is persuaded, even in the absence of on-point precedent, that responding to a missing person report falls within the scope of this principle. As an Eighth Circuit case (miscited by defendants as a Seventh Circuit decision) says:

> A search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the governmental interest in the police officer's exercise of the officer's community caretaking function, based on specific articulable facts, outweighs the individual's interest in being free from arbitrary government interference.

*United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014). This principle, in the Court's view, justified the Braidwood officers' stop of Ryan's vehicle.

But Ryan's claim, fairly read, involves more than just the stop itself. According to Urban's own report (an attachment to Ryan's complaint), after stopping Ryan the officers *immediately* "confirmed that the missing person [report] was removed by Marseilles." This was learned, according to Urban just as Peterson had "started talking to Aaron." Under well-established Fourth Amendment law relating to investigatory stops, Ryan has a viable claim that the stop should have ended right then. As the case cited by defendants, *Harris*, goes on to state: "The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop." *Id.*

In the Court's view, Ryan has a viable Fourth Amendment claim for damages

5

along the following lines: the stop should have ended the moment the officers learned that the missing person report—the sole basis for the stop—had been removed, or at least when the officers confirmed Ryan's identity by looking at his identification. But the stop did not end there. The officers took it upon themselves to continue the stop and, ultimately, to perform a record check. The record before the Court permits a reasonable inference that, as a matter of established Fourth Amendment law, the events that led to Ryan's arrest, the impoundment and towing of his car, and the resulting loss of his job and his apartment, all resulted from an improper continuation of the stop after its purpose had been satisfied. And if the defendants (whose motion does not even address the question of the scope and duration of the stop, thus forfeiting the point for purposes of the motion to dismiss) contend, contrary to Urban's report, that events happened in a different sequence, there are disputed factual issues that preclude dismissal on the merits or based on qualified immunity.

## Conclusion

For the reasons stated above, the Court dismisses the Braidwood Police Department as a defendant, and dismisses plaintiff's claim to the extent it involves the traffic stop itself, but otherwise denies defendant's motion to dismiss [dkt. no. 21]. The Court gives plaintiff leave to file an amended complaint by February 23, 2026, in which plaintiff may name the Village of Braidwood as a defendant (as an indemnitor of its officers under 745 ILCS 10/9-102) and any other defendants he proposes to add at this point. The telephonic status hearing set for February 18, 2026 is vacated and reset to March 5, 2026 at 8:45 a.m., using call-in number 650-479-3207, access code 2305-915-

6

8729.

Date: February 9, 2026

_____
MATTHEW F. KENNELLY
United States District Judge